| | |
|---|---|
| MARK O'LEARY<br><br>    Plaintiff,<br><br>v.<br><br>PATRIOT SUBARU OF SACO, INC.<br><br>    Defendant. | Docket No. |

<u>COMPLAINT</u>
<u>JURY TRIAL REQUESTED</u>
<u>INJUNCTIVE RELIEF REQUESTED</u>

NOW COMES Plaintiff, Mark O'Leary ("O'Leary" or "Plaintiff"), by and through his undersigned counsel, and complains against Defendant Patriot Subaru of Saco, Inc. ("Defendant") as follows:

<u>INTRODUCTION</u>

1. O'Leary was subjected to unlawful age discrimination and whistleblower retaliation by his employer, the Defendant.

2. O'Leary was sixty-one (61) years old when Defendant unlawfully terminated him.

3. At all relevant times, Defendant perceived O'Leary to be at risk for serious illness or death from COVID-19 because of his age.

4. O'Leary had engaged in protected activity under the Maine Whistleblower Protection Act ("MWPA") when, on multiple occasions, he reported concerns that Defendant was miscalculating his commission and improperly underpaying him and other employees ("Protected Activity").

5. Before Defendant's retaliatory and discriminatory termination, O'Leary was a successful and profitable Sales Manager for Defendant.

1

6. Defendant's stated reason for termination that O'Leary was part of a "mass furlough to help control staffing related to the COVID-19 pandemic" was pretext for unlawful age discrimination and whistleblower retaliation.

7. The real reason Defendant terminated O'Leary was because of his age and in retaliation for his Protected Activity.

<u>JURISDICTION AND PARTIES</u>

8. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*, the Maine Whistleblowers Protection Act ("MWPA"), 26 M.R.S. § 833, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.*

9. O'Leary is a United States citizen residing in the Town of Scarborough, County of Cumberland, State of Maine.

10. Defendant is a car dealership and corporation with a principal place of business in the City of Saco, State of Maine.

11. Defendant is an "employer" as that term is defined in the MHRA, WPA, and ADEA.

12. This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

13. On or around March 17, 2021, Plaintiff filed a Complaint for Discrimination against Defendant, alleging unlawful whistleblower retaliation and age discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

14. On or around March 22, 2022, the MHRC issued a Notice of Right to Sue with respect to Plaintiff's claims.

15. Plaintiff has also obtained a Notice of Right to Sue from the EEOC.

16. Plaintiff has exhausted his administrative remedies with respect to all claims set forth in this Complaint that requires administrative exhaustion.

## JURY TRIAL REQUESTED

17. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

18. Defendant hired O'Leary on February 9, 2010, to be a member of its sales team.

19. O'Leary's pay was based on wholesale profits, finance and insurance (F&I) profits, and Subaru Stellar programs, as well as on commissions from sales to customers and money paid to the dealership by Subaru.

20. A few years later, in 2013, Defendant promoted O'Leary to Sales Manager.

21. As a Sales Manager, O'Leary's compensation was based on sale commissions.

22. A couple of years later, in 2015, O'Leary began having concerns about how Defendant was calculating his commissions.

23. On or around January 31, 2019, Defendant put into place a new Sales Management Compensation Agreement.

24. Defendant rarely shared its financial statements with its sales managers.

25. Consequently, O'Leary was unable to verify if commissions were paid properly.

26. When O'Leary would ask how Defendant calculated his commissions, the General Manager, Brian Beattie ("Beattie"), and the General Sales Manager, David Shoemaker ("Shoemaker"), would tell him that they could make the commission percentage anything they wanted. When O'Leary would ask about whether commissions were paid properly, Beattie and Shoemaker would also frequently tell O'Leary that the final number was

3

determined in the office and Defendant's Controller, Pat Berryman ("Berryman") was still working with the numbers and would send out the final numbers when calculated.

27. This caused O'Leary to believe Defendant was underpaying its sales team.

28. In July, 2018, Defendant's store managers celebrated breaking a sales record by going to a bar.

29. At the bar, Defendant asked Beattie why he was not being paid what he deserved.

30. Beattie replied to O'Leary that Beattie had other things he needed to pay for.

31. About one year later, in August 2019, O'Leary suspected that his commission check was not based on real numbers.

32. O'Leary confronted Berryman about underpaying his commission.

33. Without reviewing any documents or conducting any investigation, Berryman told O'Leary that his commission sheet wash out form was correct.

34. O'Leary told Berryman, "I bet the Labor Board can figure it out."

35. The next day, the owner of Defendant, Adam Arens ("Arens"), agreed to show O'Leary the financial statements.

36. This was one of the few occasions that Defendant permitted O'Leary to review Defendant's financial statements.

37. As a result of O'Leary's complaint, Beattie presented O'Leary with a commission sheet showing that Defendant owed O'Leary a sizable amount of money more than he was paid in the original compensation check.

38. Defendant agreed to pay O'Leary the additional money owed to him.

39. O'Leary reported his concerns about underpayment of wages many times, orally and in emails to management.

40. O'Leary also reported concerns on behalf of sales representatives who came to O'Leary with questions about their pay.

41. Defendant's sales team would communicate with O'Leary in person or by email and ask, "Why is my pay wrong?" and things to that effect.

42. After receiving emails and verbal questions from his sales team, O'Leary would share their concerns to Defendant including the General Sales Manager and other sales managers about the underpayment of sales commissions.

43. O'Leary's reports to Defendant about underpayment and miscalculation of wages on behalf of himself and other employees constitutes protected activity for purposes of the MWPA.

44. O'Leary made his reports in order to remedy what he believed to be a violation of the laws requiring that employer's pay employee's what they are owed and to shed light on and oppose the Defendant's practice of failing to pay its employees what they were owed.

45. After emailing with Arens, Beattie berated O'Leary for speaking with Arens about his pay. Beattie told O'Leary that he had to deal directly with Beattie regarding all matters.

46. O'Leary reminded Beattie about his previous statement that O'Leary had "other things he needed to pay for."

47. In the Fall of 2019, O'Leary attended a sales training in Salem, Massachusetts.

48. On information and belief, while O'Leary was attending that sales training in Salem, Massachusetts, Defendant's management team went through O'Leary's email account and deleted emails between him, Arens, Beattie, and Shoemaker.

49. After that, Defendant's management team did not communicate with O'Leary about any sensitive subjects over email and O'Leary's access to much of the information relating to costs and commissions was taken away.

50. When COVID-19 was declared a national emergency and lockdowns began to take effect on or around April 1, 2020, Defendant scaled down to a skeleton crew.

51. Defendant told employees that everyone would be called back to work when it reopened.

52. On May 29, 2020, Shoemaker called O'Leary and informed him that O'Leary was being laid off.

53. O'Leary respectfully disagreed with the decision to lay him off and asked why he was laid off, but not L.P. (age 52), a sales manager who worked for Defendant since 2018.

54. Shoemaker told O'Leary that he was laid off because of the hours that needed to be worked and because O'Leary was at greater risk.

55. O'Leary stated that he respectfully disagreed with Shoemaker's explanation for the layoff and how Defendant was handling the situation.

56. The CDC guidance at the time of Shoemaker's comments and to the present provides that older persons and persons with certain health conditions were at greater risk of suffering serious illness or death from a COVID-19 infection and that the risk increased based on age so that a person in their sixties was at greater risk than a person in their fifties.

57. L.P.'s numbers were not as good as O'Leary's with regard to financial productivity and customer relationships.

58. Defendant retained L.P. instead of O'Leary because of age discrimination and whistleblower retaliation.

59. The Finance Manager, B.B., age 64, was also laid off.

60. Shoemaker emailed B.B. and told him that the dealership was bringing back employees who could work longer hours and were not a high risk during the pandemic.

61. Defendant made company-wide decisions about which employees to allow to return from furlough and which employees to terminate in part based on the understanding of Defendant's leadership that older employees would be at greater risk of serious injury or death if they contracted COVID-19.

62. L.P. told O'Leary that he was hired in 2018 to replace him.

63. M.A. told O'Leary that he was hired in 2019 to replace him.

64. Probative timing evidences a causal connection between O'Leary's Protected Activity and his termination.

65. Defendant has provided false and pretextual explanations for O'Leary's evidence.

66. Defendant's pretextual rationales for O'Leary's termination evidence an effort to dissemble the facts to cover up a discriminatory and retaliatory purpose.

67. Shoemaker's statement to O'Leary at the time that he informed O'Leary prove that O'Leary's age was a factor that made a difference in the termination decision.

<u>COUNT I: MWPA & MHRA – Whistleblower Retaliation</u>

68. Paragraphs 1 – 67 are incorporated by reference.

69. The MHRA makes it unlawful for an employer to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions that are protected under the MWPA.

70. The MWPA makes it unlawful for an employer to discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms,

conditions, location or privileges of employment because the employee, acting in good faith, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of Maine or the United States.

71. The MHRA makes it unlawful for any person to discriminate against any individual for engaging in protected activity as set out in §4633 of the MWPA.

72. Defendant's conduct violates the MHRA and MWPA.

<u>COUNT II: MHRA – Age Discrimination</u>

73. Paragraphs 1 – 72 are incorporated by reference.

74. The MHRA makes it unlawful for an employer to discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because of the employee's age.

75. The MHRA makes it unlawful for an employer to discriminate against an employee because of the employee's age.

76. Defendant's conduct violates the MHRA.

<u>COUNT III: ADEA</u>

77. Paragraphs 1 – 76 are incorporated by reference.

78. The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age.

79. The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of the employee's age.

80. Defendant's conduct violates the ADEA.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.     Declare the conduct engaged in by Defendant to be in violation of his rights;

B.     Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.     Award equitable-relief for back pay, benefits and prejudgment interest;

D.     Award compensatory damages in an amount to be determined at trial;

E.     Award punitive damages in an amount to be determined at trial;

F.     Award liquidated damages in an amount to be determined at trial;

G.     Award nominal damages;

H.     Award attorney's fees, including legal expenses, and costs;

I.     Award prejudgment interest;

J.     Permanently enjoin Defendant from engaging in any employment practices that violate the MHRA, MWPA and/or ADEA;

K.     Require the leadership of Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate retaliation or discrimination in the future;

L.     Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

M.     Require that Defendant train all management level employees on the protections afforded by the MHRA, MWPA and ADEA;

9

N.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of discrimination and retaliation; and

O.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated: June 9, 2022

/s/ Chad T. Hansen
Chad T. Hansen
Attorney for Plaintiff

/s/ Martin P. Tartre
Martin P. Tartre
Attorney for Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343

chad@employeerightslaw.attorney
martin@employeerightslaw.attorney